**SICO FOUNDATION**

v.

**UNITED STATES.**

No. 338-57.

United States Court of Claims.

Nov. 1, 1961.

Rehearing Denied Jan. 12, 1962.

See 297 F.2d 557.

Fleming Bomar, Washington, D. C., for plaintiff. Ivins, Phillips & Barker, Washington, D. C., were on the briefs.

Joel N. Simon, Silver Spring, Md., with whom was Asst. Atty. Gen. Louis F. Oberdorfer, for defendant. Philip R. Miller, Washington, D. C., was on the briefs.

PER CURIAM.

This case was referred by the court, pursuant to Rule 45, 28 U.S.C.A. to Trial Commissioner Lloyd Fletcher for a report of the facts and his recommendation for a conclusion of law. The Trial Commissioner has made his report and recommendation, supported by an opinion, and the case is now before the court on exceptions to the Commissioner's report, supported by briefs and oral argument. Since the court is in full agreement with the Commissioner's findings of fact and with his opinion supporting his recommendation, it adopts his findings of fact and opinion and concurs in his recommendation for the conclusion of law to be entered. The court, however, would like to make a few brief observations of its own.

In our prior decision in this case (102 F.Supp. 197, 121 Ct.Cl. 373) we held that the destination, and not the source, of a corporation's income was the decisive factor in determining its exempt status. This was in accord with the weight of the authorities, although there were respectable authorities to the contrary. But, in section 301(b) of the Revenue Act of 1950 (64 Stat. 906, 953), 26 U.S.C.A. § 101, Congress said that the source, rather than the destination, was the determinative factor.

Unquestionably the source of plaintiff's income was from a trade or business that was carried on for profit. Plaintiff itself carried on no educational or charitable activities, if we disregard what plaintiff did with the profits it made, as we must under section 301(b) of the Revenue Act of 1950. That it gave all its profits to an educational institution availeth it nothing in the mundane field of taxation, however much the children in our schools have profited from its beneficence. Instead of itself carrying on educational activities, it provided the money for others to do so. Such a corporation lost its exemption after the passage of the Revenue Act of 1950.

The Tenth Circuit Court of Appeals and the District Court came to the same conclusion under comparable facts in Veterans Foundation v. United States, 178 F.Supp. 234; affirmed 281 F.2d 912.

Plaintiff claims that it is taxable under the Revenue Act of 1950, 26 U.S.C.A. §§ 421, 422 only on its "unrelated business net income." "Unrelated business net income" means income not related to a corporation's charitable or educational activities. But plaintiff had no charitable or educational activities. All these activities were carried on by others. All of plaintiff's activities were for profit, if we disregard what it did with its profits, as we must under 301(b) of the Revenue Act of 1950.

Since the destination of a corporation's income is no longer decisive in determining its right to exemption, we must conclude that plaintiff is not exempt. Therefore, plaintiff is not entitled to recover on its claim set out in paragraph 17 of its petition, and the petition as to this claim will be dismissed.

But, for the reasons stated by the Trial Commissioner, plaintiff is entitled to recover on that portion of its claim relating to payments to the State Teachers Colleges for scholarships, and it is entitled to a deduction in 1951 of the fees for professional services. Judgment will be entered to that effect, with the amount of recovery to be determined pursuant to Rule 38(c).

It is so ordered.

The Trial Commissioner's opinion, findings of fact, and recommendation follow:

### Opinion of the Commissioner

This plaintiff has come to the Court of Claims for the second time asking that it be held exempt from Federal taxation. The first time it was successful.[1] In the belief that Section 301(b) of the Revenue Act of 1950 (64 Stat. 906, 953) has removed the basis for the court's first decision, the defendant has again attacked plaintiff's status for the later calendar years 1951, 1952, and 1953. Defendant says that plaintiff is what has become known in this field of tax law as a "feeder corporation." If defendant is correct in

1. In the earlier case the plaintiff was known as The SICO Company. It was held exempt from Federal employment taxes for years prior to 1951 in The SICO Company v. U. S., 102 F.Supp. 197, 199, 121 Ct.Cl. 373 (1952), the opinion being delivered for a unanimous court by Judge Littleton. In rejecting the defendant's contention that, notwithstanding the fact all of plaintiff's net income was destined to the public schools of Pennsylvania, exemption should be denied because plaintiff was engaged in a commercial business for profit, the court said:

"* * * It is sufficient to say that the great weight of authority on the question presented is to the effect that under facts such as are involved in this case, the exemption from taxation granted by the statutes makes the destination of the income, that is, the purpose and object to which it is devoted, rather than its source, the ultimate test of its exemption."

this assertion, then plaintiff is burdened with the same tax treatment as any ordinary business corporation.

As Judge Littleton pointed out in the first SICO decision, the law prior to 1951 had been rather clearly established that the destination of an organization's income was more important than the source of its income for purposes of determining exemption from taxation.[2] Experience under this rule, however, showed it to be subject to abuse by those who would subvert its principle into a vehicle for the enjoyment of an unfair competitive advantage in the market place. Thus, a nationwide vendor of macaroni could receive its net profits free of income tax simply because, unlike its competitors, those net profits were destined to an educational institution;[3] and in like manner, a commercial beach facility could enjoy a tax advantage over its competitors because the net income from its business activities was destined to a charitable organization.[4] The ensuing cry of "unfair competition"[5] fell on sympathetic ears in the 81st Congress which responded with the Revenue Act of 1950.

Insofar as relevant to the present case, the changes made by that Act in the statutory pattern affecting exempt organizations were twofold:[6]

(1) With respect to an organization engaged in carrying on *both* charitable activities *and* an active trade or business Congress established a new concept of "unrelated business taxable income" and imposed a tax upon such income derived from the unrelated trade or business[7] without, however, affecting the basic exemption of the organization.[8]

(2) With respect to a feeder corporation, Congress removed any pre-existing exemption of such an organization by Section 301(b) using the following language:

"An organization operated for the primary purpose of carrying on a trade or business for profit shall not be exempt under any paragraph of this section on the ground that all of its profits are payable to one or more organizations exempt under this section from taxation. For the purposes of this paragraph the term 'trade or business' shall not include the rental by an organization of its real property (including personal property leased with the real property)."[9]

The plaintiff now claims that it falls within the ambit of change (1) described above and states in its reply brief that it would be "pleased to pay corporate income taxes on any income which it may derive from the operation of a business."[10] It resists vigorously, however, the present attempt by the Government to remove its exemption status entirely, contending that all its other income (mostly rents and interest) is "passive" and thus beyond the sweep of the unrelated business income tax. The defendant responds that plaintiff is a typical "feeder

---

**2.** The SICO Company v. U. S., 102 F.Supp. 197, 121 Ct.Cl. 373, 389.

**3.** See C. F. Mueller Co. v. Commissioner, 190 F.2d 120 (3d Cir.1951).

**4.** See Roche's Beach Inc. v. Commissioner, 96 F.2d 776 (2d Cir.1938).

**5.** See H.R.Rep. No. 2319, 81st Cong., 2d Sess., p. 36 and Sen.Rep. No. 2375, 81st Cong., 2d Sess., p. 28, 2 U.S.Code Cong. Service 1950, p. 3053.

**6.** A full discussion of the statutory changes is contained in Sugarman and Pomeroy, "Business Income of Exempt Organizations," 46 Va.L.Rev. 424 (1960).

**7.** I.R.C.1939, Secs. 421, 422, added by Ch. 944, Sec. 301(a) 64 Stat. 948 (1950), 26 U.S.C.A. § 421 (now I.R.C.1954, Secs. 511–513, 26 U.S.C.A. §§ 511–513).

**8.** I.R.C.1939, Sec. 101, added by Ch. 944, Sec. 301(c), 64 Stat. 948 (1950), 26 U.S. C.A. § 101 (now I.R.C.1954, Sec. 501 (b), 26 U.S.C.A. § 501(b)).

**9.** I.R.C.1939, Sec. 101, next to last paragraph, added by Ch. 944, Sec. 301(b) 64 Stat. 953 (1950), 26 U.S.C.A. § 101 (now I.R.C.1954, Sec. 502, 26 U.S.C.A. § 502).

**10.** During each year involved herein, plaintiff has suffered substantial net losses from the operation of its business, and hence the offer to pay tax presumably refers to the possibility of profitable business operations in subsequent years.

organization" and, as such, falls precisely within the ban of the statutory language quoted in the description of change (2) above.

In order to determine the impact on this plaintiff of the statutory changes worked by the Revenue Act of 1950, it will be convenient to review briefly the facts regarding plaintiff's activities even though there has been little significant change therein since the time of the court's first decision.

The plaintiff is a nonstock, charitable corporation and was incorporated in Delaware originally under the name of The SICO Company. In 1955 the name was changed to The SICO Foundation. The founder of the organization was Clarence Schock who died in 1955. As a young man he had encountered serious financial difficulties in obtaining a college education. As a consequence, he became interested, first in providing direct aid to the public schools of Pennsylvania, and, later, in establishing a means whereby financial aid could be extended to worthy students desirous of obtaining advanced education in the state teachers colleges of Pennsylvania. In 1941 Mr. Schock caused the plaintiff organization to be incorporated and transferred to it controlling stock interests which he owned in several corporations engaged generally in the business of selling and distributing petroleum products. Through the medium of dissolution, the plaintiff acquired the assets of the Schock companies and commenced direct operation of their businesses. As stated in more detail in finding 8 the plaintiff's organizational facilities, its sources of income, and its business activities were substantially the same during the years in question as those during the period at issue in the prior litigation before the court. However, there was an increase provided for in the number of plaintiff's directors, a majority of whom were directly associated with public education, including several presidents of state teachers colleges

and a county superintendent of public schools. Plaintiff also changed its manner of distributing its funds for educational purposes from that of making direct payments to local public school districts of Pennsylvania [11] to the establishment of a fairly extensive scholarship program in several state teachers colleges in Pennsylvania. During the three years here involved, plaintiff committed nearly $55,000 in scholarship funds to the participating teachers colleges and actually paid out slightly over $34,200 to the colleges for use in their scholarship awards. The record clearly establishes that these scholarships have served to increase student attendance and hence have resulted in the training of more qualified public school teachers than might otherwise have been true.

Aside from such distribution of its income, however, the main corporate activities of plaintiff have revolved around its petroleum business. Its gross sales of petroleum products were quite substantial, averaging about $5,400,000 per year. Although plaintiff actually lost money in the operation of its petroleum business during the years involved here, this has not been its experience either in the prior periods involved in the first decision, or in most years subsequent to 1953.[12] Offsetting these losses, plaintiff received during the years in question substantial amounts of interest, rent, and other so-called "passive" income.

However, the record establishes that apart from its purpose to distribute its income to state teachers colleges, plaintiff has operated for the primary purpose of carrying on its business of selling petroleum products. This being true, plaintiff must be classified as a feeder organization, and therefore its exempt status was revoked by the enactment of Section 301(b) of the Revenue Act of 1950, supra, for years subsequent to 1950. Indeed, the court seems to have said as much in its first decision regarding this plaintiff. It held plaintiff "exempt from

11. This was the method of distribution employed by plaintiff during the time involved in the prior litigation.

12. Plaintiff's brief, p. 11.

taxation under the exemption provisions of the statutes in effect *prior to the enactment of Section 301(b), Title III, of the Revenue Act of 1950."* [13] [Italics supplied.]

The danger signal went up again in Knapp Brothers Shoe Mfg. Corp. v. U. S., 142 F.Supp. 899, 135 Ct.Cl. 797. In considering the exemption status of a shoe manufacturing corporation whose income was destined to a qualified educational institution, the court remarked at page 901 of 142 F.Supp. at page 801 of 135 Ct. Cl.:

> "There was litigation as to whether section 101(6), above quoted, granted exemption to a corporation which engaged in a regular commercial business, even though its income was devoted exclusively to one of the purposes named in the statute. In C. F. Mueller Co. v. Commissioner, 3 Cir., 190 F.2d 120, Sico Co. v. United States, 102 F.Supp. 197, 121 Ct.Cl. 373, and Southeastern Fair Ass'n v. United States, 52 F.Supp. 219, 100 Ct.Cl. 216, that question was answered in the affirmative. Contra, United States v. Community Services Inc., 4 Cir., 189 F.2d 421.

> *"The exemption for such enterprises was eliminated by section 301 (b) Title III, of the Revenue Act of 1950, 64 Stat. at page 953, 26 U.S.C.*

*(1952 Ed.) § 101(12) (B) (ii)."* [14] [Italics supplied.]

The warning seems clear enough. But plaintiff argues nonetheless that Section 301(b) ought not to be applied here because, as plaintiff reads the legislative history of the statute, Congress has aimed at feeder organizations differing materially from plaintiff.[15] The fact that, aside from its business activities, plaintiff earns substantial passive income in the form of interest and rents is pointed to as distinguishing plaintiff from the classic feeder corporation which, typically, is a subsidiary organization devoted exclusively to the conduct of a commercial business and feeding the income therefrom to its parent, an exempt corporation.[16] However, this argument appears to overlook the fact that Congress did not confine the scope of Section 301 (b) to organizations whose *exclusive* purpose is the conduct of a business; rather the statute speaks of organizations whose "primary purpose" is the conduct of a business. Hence, the statute obviously calls for a broader interpretation than that contended for by the plaintiff. The finding that plaintiff's *primary* purpose (aside from its purpose to distribute its income to educational institutions) was the carrying on of its petroleum business brings it fairly within the scope of Section 301(b).

13. 102 F.Supp. 197, 200, 121 Ct.Cl. 373, 389.

14. The court went on to hold that the Knapp Company was entitled to exemption for years beginning *prior to January 1, 1951* because the statute there involved precluded retroactive application of Section 301(b) as to certain educational organizations or hospitals.

15. A preliminary question drawn from the literal words of Section 301(b) may be noticed here. The statute removed exemption from organizations conducting a business and feeding their income "to one or more organizations *exempt under this section,*" namely, Section 101. Plaintiff's income was paid to state colleges and public school districts which are exempt from Federal income taxes, not entirely because of Section 101, but more specifically because of Section 116 of the 1939 Code and, plaintiff says, as a matter of constitutional law. From this, plaintiff infers that it is beyond the technical coverage of Section 301(b). The point does not appear to be well-taken, however, since the recipients of plaintiff's income are not only exempt under Section 116 as state institutions but also under Section 101(6) as educational institutions.

16. Cf. Veterans Foundation v. United States, D.C., 178 F.Supp. 234, aff'd Sept. 12, 1960, 281 F.2d 912 (10th Cir.) where the taxpayer engaged solely in the conduct of a business and was held nonexempt under Section 301(b) although all its net profits went to charity. Unlike the present case, however, that taxpayer seems to have received no passive, or nonbusiness, income.

Plaintiff further insists, however, that a proper statutory interpretation requires a consideration of Section 301(a) (cited in footnote 7, supra), wherein Congress established a new concept of taxing exempt organizations on their "unrelated business net income." In explaining this new concept, the Senate Finance Committee stated:

"The problem at which the tax on unrelated business income is directed is primarily that of unfair competition. The tax-free status of section 101 organizations enables them to use their profits tax-free to expand operations, while their competitors can expand only with the profits remaining after taxes. Also, a number of examples have arisen where these organizations have, in effect, used their tax exemptions to buy an ordinary business. That is, they have acquired the business with little or no investment on their own part and paid for it in installments out of subsequent earnings—a procedure which usually could not be followed if the business were taxable.

"In neither the House bill nor your committee's bill does this provision deny the exemption where the organizations are carrying on unrelated active business enterprises, nor require that they dispose of such businesses. Both provisions merely impose the same tax on income derived from an unrelated trade or business as is borne by their competitors. In fact it is not intended that the tax imposed on unrelated business income will have any effect on the tax-exempt status of any organization. *An organization which is exempt prior to the enactment of this bill, if continuing the same activities, would still be exempt after this bill becomes law.* In a similar manner any reasons for denying exemption prior to enactment of this bill would continue to justify denial of exemption after the bill's passage." [Italics supplied.] [17]

Plaintiff points to the italicized wording in the above quotation as conclusive in plaintiff's favor. The argument is that since this court has previously held plaintiff exempt and its activities have remained substantially unchanged, Congress has indicated its intention that the previous exemption shall remain intact with only the unrelated petroleum business income to be taxed in order to avoid an unfair competitive impact on plaintiff's non-exempt competitors.[18] To accept this interpretation, however, would be to read Section 301(b) right out of the statute. In its first SICO decision, the court observed that by the great weight of authority all organizations such as plaintiff were exempt under the law as it then existed *simply because the destination of their income was to exempt organizations.* Plaintiff's argument, therefore, would lead to a result whereby all feeder organizations possessed of exemption by reason of the destination of their income would retain their exemption as such, even after 1951, but would be taxable under Sections 421 and 422 on their unrelated business income. Surely, Section 301(b) is not to be so emasculated.

When the Senate Finance Committee explained that the new concept of taxing unrelated business income was not intended to affect the exemption of an "organization which is exempt prior to the enactment of this bill," it is quite clear that the Committee was referring to those organizations which themselves actually performed the ultimate exempt functions, and not those which were exempt merely because their income was destined to charity or education. The latter had already received attention in Section 301(b). Only by treating the two types of organizations as separate and distinct can the statutory pattern estab-

---

17. Sen.Rep. No. 2375, supra, pp. 28–29, 2 U.S.Code Cong.Service 1950, p. 3081; 1950–2 C.B. 504–5.

18. Plaintiff has stated its agreement that its business income, if any, should be taxed. Plaintiff's Brief, p. 8.

lished by the Revenue Act of 1950 be properly understood.

In the first SICO decision, the court did not grant exemption because plaintiff was itself an exempt educational institution. Clearly, neither then, nor during the years involved here, was plaintiff engaged in direct educational activity. It was exempt because it gave its income to organizations which were so engaged, an exemption which it lost when Congress enacted Section 301(b).

■ It is fully recognized that, unlike the statutory provisions dealing with deductions from gross income, the exemptions provided for charitable and educational organizations are to be liberally construed in the taxpayer's favor since they are "begotten from motives of public policy."[19] This liberal approach, however, must not be stretched to a point where it results in ignoring the realities of a commercial business activity conducted by the organization in question.[20] This plaintiff's income is spent in furtherance of one of the most honored and important functions of our States. It is a worthy organization indeed. In the light of Section 301(b), however, if organizations such as plaintiff are to be exempted from taxation, the doing of it should be a legislative act, not a judicial one.

By reason of the recommendation that the court should hold plaintiff a non-exempt corporation, it becomes necessary to give consideration to the alternative contentions whereby plaintiff disputes the disallowance by the Commissioner of Internal Revenue of the scholarship payments and professional fees described in findings 9 and 13, respectively. As to the payments made by plaintiff to the several state teachers colleges for scholarship awards, it would appear that plaintiff has abandoned any possible contention that such payments are deductible by it in full as ordinary and necessary business expenses. Although such a claim appears to be stated in general terms in paragraph 18 of the petition, nothing has been found in the record or briefs submitted by the plaintiff indicating any intention to press the claim. If the assumption is correct that plaintiff has abandoned this claim, presumably it is due to the provisions of Section 23(a)(1)(B) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 23(a)(1)(B), which appears quite clearly to preclude any such contention.

■ It is believed, however, that plaintiff's scholarship payments are deductible by it as contributions to a State for exclusively public purposes subject, however, to a limitation in amount not exceeding 5 percentum of plaintiff's net income computed without regard to such deduction. Section 23(q)(1), Internal Revenue Code of 1939. Although defendant contends that the scholarship awards by plaintiff were, in effect, mere gifts to individual students, the record clearly shows that the payments were made to the state teachers colleges themselves and that plaintiff had no part in the selection of any individual recipient of a scholarship. Accordingly plaintiff seems clearly entitled to deductions in this regard for the years in question as provided in Section 23(q). Since the record is incomplete with respect to the amounts of any such deductions, it is recommended that they be determined as contemplated by Rule 38(c).

Finally, it is necessary to consider the question of whether the professional fees described in finding 13 were properly deductible, as claimed by plaintiff, in the year 1951, or whether such fees should

19. Helvering v. Bliss, 293 U.S. 144, 55 S. Ct. 17, 20, 79 L.Ed. 246; Bohemian Gymnastic Association v. Higgins, 2 Cir., 147 F.2d 774; Samuel Friedland Foundation v. U. S., D.C., 144 F.Supp. 74; GCM 21610, 1939-2 C.B. 103. The consequent loss of tax revenues is generally deemed to be compensated for by the corresponding relief to the Government from financial burdens incident to the promotion of the general welfare. See H.R.Rep. No. 1860, 75th Cong., 3d Sess., 19, 20.

20. Horace Heidt Foundation v. U. S., 145 Ct.Cl. 322, No. 361-52, decided March 4, 1959, 170 F.Supp. 634; Veterans Foundation v. U. S. supra, note 16.

have been deducted by plaintiff in the year 1950, as contended by defendant. Since plaintiff's books are kept on an accrual basis, and the services for which the fees were paid were rendered for the most part in 1950, defendant asserts that 1950 is the proper year of deduction even though the payments by plaintiff were made in 1951. Plaintiff asserts that it did not know the amounts payable for these services until bills were received in January 1951, and that, therefore, the proper year of deduction is 1951. Plaintiff is sustained in this contention by the court's decision in Canton Cotton Mills v. United States, 94 F.Supp. 561, 119 Ct.Cl. 24. There, legal services had been rendered to the taxpayer in 1934, 1935, and 1936, and though there was no dispute that liabilities existed with respect to the services rendered by the attorneys, the *amount* of the fees was not established until February 1936. The court allowed the accrual-basis taxpayer in that case to deduct the attorneys' fees in 1936, saying at page 565 of 94 F.Supp., at page 39 of 119 Ct.Cl.:

"The Government also contends that the amount of the fee attributable to the services rendered in 1934 and 1935 is not a proper deduction for 1936. As the fees to be paid were not determined and fixed until 1936, this contention is not convincing. Old Colony Trust Associates v. Hassett, D.C., 55 F.Supp. 629. Moreover, it is doubtful if plaintiff could have deducted any amount for attorneys' fees in 1935; no fee arrangements had been made by the end of that year and the mere fact that some services had been performed would not establish an accrual. Crown Cork & Seal Co., Inc., v. United States, D.C., 4 F. Supp. 525, affirmed, 2 Cir., 73 F.2d 997. The general rule, as deduced from United States v. Anderson, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347, is that an expense accrues in the year in which all the events occur which determine the liability *and fix its amount*. If the liability is

contingent *or its amount unsettled,* the expense does not accrue." [Italics supplied.].

Here the evidence shows that plaintiff did not know the amount of the fees until bills were received around the middle of January 1951. Until that time, plaintiff could not know whether it would agree or disagree as to the amounts charged. The fact that it knew the amount of fees sometime prior to the filing of its 1950 income tax return is irrelevant under the accrual theory of taxation, so long as the amounts were unknown at December 31, 1950.

Accordingly, plaintiff was correct in deducting the professional fees in its tax return for the calendar year 1951. The amount of refund to which plaintiff is entitled should be determined pursuant to Rule 38(c).